# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 25, 2001

## STATE OF TENNESSEE v. DAMIEN JACKSON

**Appeal from the Criminal Court for Davidson County**
**No. 98-C-2159      Cheryl Blackburn, Judge**

---

**No. M2000-00763-CCA-R3-CD - Filed July 18, 2001**

---

The Defendant, Damien Marcess Jackson, was indicted for first degree murder and two counts of attempted first degree murder. A jury convicted the Defendant of second degree murder and two counts of attempted second degree murder. He was subsequently sentenced as a Range I offender to twenty-five years for the murder and twelve years for each of the attempted murders, all to run consecutively. In this appeal as of right, the Defendant challenges the trial court's denial of his motion to suppress; the trial court's refusal to order the State to disclose the identity of a confidential informant; the sufficiency of the evidence; and the length and manner of service of his sentences. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Karl F. Dean, Public Defender; C. Dawn Deaner, Assistant Public Defender; and Jeffrey A. DeVasher, Assistant Public Defender, Nashville, Tennessee, for the appellant, Damien Jackson.

Paul G. Summers, Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On the night of April 29, 1998, Tennessee State University student Cicely Mitchell was celebrating her birthday at Teddy Fayne's house on Torbett Street in Nashville, Tennessee. Twenty to forty people were gathered at the house, including many of Mitchell's sorority sisters. Mitchell, John Hart and Herschel King were seated on a bed in the front room of the house; numerous other people were in the room as well. This room was adjacent to the front porch from which a door

opened into the room. The front of the room, facing the street, contained a large window, against which rested the headboard of the bed. The window was further covered by closed blinds.

As the three sat there, Mitchell heard what she thought were firecrackers. Someone pushed her down and off the bed. She testified that her body started feeling very hot; eventually she discovered that she had been shot four times: once each in her left wrist, right biceps, back, and hip. Her femoral artery was severed. Mitchell heard no warning prior to the shots being fired and did not see the shooter.

John Hart testified that, as he was sitting on the bed, he heard a "very loud sound." Someone inside the house said "get down," and he jumped off the bed onto the floor. He testified that "the shots were continuously firing over and over for it seemed like forever" and that there had been "no warning." Hart was shot three times, once each in his right hand, right knee, and back. Hart stated that the shot to his knee "completely blew off one-third of [his] kneecap." Hart saw King on the floor and watched someone come in and perform CPR on him. Hart testified that he saw King cough up blood but that there was no other response. A subsequent autopsy revealed that King died from multiple gunshot wounds.

Carimah Hickman was at the party and walked out of the house through the door of the bedroom onto the front porch with Candace Casey. She saw a man dressed in black who appeared to be wearing a mask. She was about fifteen feet away from the man and saw that he had a gun. She stated that the man said something, but she did not know what. She watched the man lift the gun with both hands and saw shots being fired. She testified that the gun was pointed at her and Casey and into the house. She ran back into the house and heard someone inside say "get down." She continued to run through the house, falling and getting trampled by other frightened people.

Candace Casey walked out on the porch ahead of Hickman. She testified,
I was turning to my right to go down the walkway and step off the porch, and I saw a young man standing there in a stance with a big gun aiming to the window, and he yelled out, get down, or something, and by then I saw the fire flash from the gun, and myself and Carimah hit the ground and ran back in the house.

She stated that she recalled thinking that the shooter was wearing a mask, and she explained that he held the gun at chest level, aiming it, with the shots going in the window.

Officer Frederick Teague was one of the first officers on the scene. He testified that, when he arrived, he could see shadows and movement in the house through the window. He testified he "could see just bodies moving back and forth inside the house." He noticed several bullet holes in the window and saw where the bullets had penetrated interior walls.

Officer David Crowder investigated the scene and found eleven bullet strikes to the house. He found eight or nine shell casings from a semi-automatic assault rifle. At least three bullets passed

through the window and through an interior wall of the house into another room. Several bullets passed through the headboard that was against the window.

On the evening of the next day, Detective Tim Mason received information from an informant which directed him to go to 712 Lena Street because that was where the shooter was located. The informant further indicated to Detective Mason that the assailant had left the scene, gone home, put on a McDonald's uniform, and then returned to the scene and watched the police officers conduct their preliminary investigation. Detective Mason went to the address, which was approximately two and one-half blocks from Fayne's house. He learned that the Defendant lived at the house, and he set up surveillance. There was no activity. The next day, Detective Mason located the McDonald's at which the Defendant worked. The Defendant's time card information revealed that, while he had worked the night of the shooting, he had gotten off work prior to the time of the shooting.

Detective Mason returned to the house on Lena Street and called for back-up. As he was pulling up to the house the Defendant's mother arrived in another car. She asked Detective Mason who he was, and he explained that he was investigating a homicide. He asked if either she or the Defendant lived there, and she responded, yes, the Defendant was her son. Detective Mason then asked if he could enter the house to search for weapons, and she responded that he would need a search warrant. She also stated that she would go in and have the Defendant come outside.

The Defendant came out and Detective Mason told him "that [he] had received some information that [the Defendant] was involved in the murder case that [he] was working on" and that he "needed to talk to [the Defendant] to either get him in or get him out of this crime." Detective Mason testified that he asked the Defendant to go to the police station with him so that they could discuss the matter, and the Defendant agreed. Detective Mason explained to the Defendant that he was not under arrest. On the way to headquarters the Defendant sat in the front seat of Detective Mason's unmarked police car. The Defendant was not handcuffed and no other police officers were in the car. During the drive Detective Mason explained to the Defendant that he had information that the weapon was in the Defendant's house and that a ballistics investigation would determine whether the bullets found at the scene had been shot from that gun. As they got closer to headquarters, Detective Mason testified, he asked the Defendant if the ballistics were going to match. The Defendant then acknowledged that the gun would be found at his house and that the ballistics would match.

At this point Detective Mason requested patrol units to secure the house until he could get a search warrant. The Detective and the Defendant continued to police headquarters. Once there, Detective Mason read the Defendant his rights, and the Defendant executed a rights waiver form. The Defendant subsequently made a videotaped statement identifying himself as the shooter and an SKS assault rifle as the weapon he used. The Defendant explained that he had earlier been insulted by a man named "Doosie," and he saw an associate of Doosie enter the house on Torbett Street. The Defendant had also argued with this man, and he decided to shoot into the house to "see if [he] can spook him and see what type of man he is."

-3-

Officer David Miller was one of the officers who responded to Detective Mason's request to secure the Defendant's house pending a search warrant. Officer Miller testified that when he arrived he saw a man and a woman standing next to the trunk of a car parked in front of the residence. Officer Miller explained to the two people why he was there; the woman then identified herself as Barbara Brown, the Defendant's mother, and told Officer Miller that she lived there. Officer Miller explained that, until the search warrant was executed, no one could leave or enter the house. The man at the car subsequently opened the car's trunk; inside were an SKS assault rifle and a .22 rifle. Ms. Brown agreed to turn these weapons over to Officer Miller without a search warrant. Subsequent ballistics testing indicated that the SKS rifle had fired the shell casings which were recovered at the crime scene. The SKS rifle was registered to the Defendant.

Agent Tommy Heflin of the TBI testified as an expert in the field of firearm identification. He described the murder weapon as a "7.62 by 39 caliber Norinco Model SKS semi-automatic rifle." He described the caliber as "mid-range," with a much larger cartridge than that used by a .22 rifle. He explained that the SKS rifle had a muzzle velocity of over 2400 feet per second with 1500 foot pounds of energy. A .22 rifle, he stated, would have a muzzle velocity of 1200 to 1300 feet per second and a muzzle energy of about 150 foot pounds.

## MOTION TO SUPPRESS

The Defendant initially contends that his statements should have been suppressed due to an unconstitutional interrogation during his ride to the police station with Detective Mason. The Defendant filed a pretrial motion to suppress the statements he made to the detective, which the trial court denied after a hearing. The Defendant's statements were subsequently admitted into evidence at trial. On appeal, a trial court's ruling on a motion to suppress may be overturned only if the evidence in the record preponderates against the trial court's findings. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Moreover, "[t]he party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of witness credibility, the weight of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial court. Id. This Court is not, however, bound by the trial court's conclusions of law. See State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). In evaluating the correctness of the trial court's ruling on the Defendant's motion to suppress, we may consider the proof adduced both at the suppression hearing and at trial. See Henning, 975 S.W.2d at 299.

The Defendant's first statement to Detective Mason was made during their ride together to the police station in Detective Mason's unmarked patrol car. During this time, the Defendant indicated to Detective Mason that it was his gun used in the shooting. The Defendant informed Detective Mason of this fact prior to Detective Mason informing him of his constitutional rights against self-incrimination as required by Miranda v. Arizona, 384 U.S. 436, 444 (1966). Accordingly, the Defendant argues, this statement should have been suppressed.

As our Supreme Court has observed, however, "police officers are only obligated to administer <u>Miranda</u> warnings prior to 'custodial interrogation' which has been defined as a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" <u>State v. Bush</u>, 942 S.W.2d 489, 499 (Tenn. 1997) (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994)). "[T]he appropriate inquiry in determining whether an individual is 'in custody' and entitled to <u>Miranda</u> warnings is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." <u>State v. Anderson</u>, 937 S.W.2d 851, 855 (Tenn. 1996). In making this inquiry, the appropriate factors to consider include the following:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

<u>Id.</u>

In its ruling on the Defendant's motion to suppress, the trial court made the following findings with respect to the Defendant's remarks to Detective Mason while in the police car:

> The testimony of Detective Mason was that he went to the defendant's home and informed the defendant that he wanted to talk to the defendant. Testimony revealed that Detective Mason either told the defendant or asked the defendant to come down with the detective. Detective Mason testified that he told the defendant that the defendant was not under arrest and that the defendant rode in the front seat of the unmarked police car. The defendant, testimony showed, was not handcuffed and the implication was that the defendant could have exited the car if the defendant had wanted.
>
> Additionally, the Court notes the good rapport that the defendant and Detective Mason had during the videotaped statement.[1] As revealed in the videotape, the defendant acknowledged that Detective Mason did not coerce the defendant at any time.

---

[1]The Defendant made a videotaped statement at the police station approximately two hours after his arrival there. In this statement the Defendant confessed to having shot the SKS assault rifle at the house on Torbett Street.

The Court finds that it is clear, under all of the facts and circumstances, that the defendant was not in custody when the defendant made the first statement to Detective Mason.

The Defendant contends that the trial court erred in reaching this conclusion, arguing that "a reasonable person in the defendant's position would not have felt free to leave" during the ride to the police station. In support of his argument, the Defendant relies on the fact that he was only eighteen years old at the time, with little, if any, previous experience with the criminal justice system; that Detective Mason had been accompanied to the Defendant's house by more than one patrol car and several uniformed officers; that Detective Mason told the Defendant that he had been implicated in a murder; that Detective Mason told the Defendant he wanted to question him at the police station instead of questioning him at home; that Detective Mason did not tell the Defendant he had a right to refuse to answer questions; and that the Defendant was inside the detective's moving car when he made his initial statement.

We disagree with the Defendant that these facts, viewed in the totality of the circumstances, preponderate against the trial court's finding that the Defendant was not "in custody" during his ride to the police station with Detective Mason. Detective Mason told the Defendant that he was not under arrest. He asked the Defendant to come to the police station so that he could "get him in or get him out of this crime." Detective Mason testified that the Defendant accompanied him to the police station "on his own" and that the Defendant expressed no reservations about going with him. The Defendant was not handcuffed and rode in the front seat of the vehicle. No other officers were in the car. Detective Mason described the distance between the Defendant's house and the police station as "short." We agree with the trial court that, under the totality of the circumstances, a reasonable person in the Defendant's position would not have considered himself deprived of freedom of movement to a degree associated with a formal arrest. Accordingly, the Defendant's initial comments to Detective Mason while in the police car prior to his having been advised of his rights against self-incrimination were admissible at trial, and this issue is without merit.

The Defendant next argues that the videotaped statement he made at the police station should have been suppressed as "'fruit' of [his] initial, illegally obtained statements." See, e.g., State v. Smith, 834 S.W.2d 915, 919 (Tenn. 1992) (holding that a confession obtained illegally from a defendant creates a rebuttable presumption that a subsequent confession, even where preceded by proper Miranda warnings, is tainted by the initial illegality). Because we uphold the trial court's decision that the initial statement was legally obtained and admissible, we find this argument to be without merit.

The Defendant also contends that neither of his statements was given voluntarily and thus their admission into evidence violated his constitutional rights. In support of this argument, the Defendant claims that Detective Mason used "coercive tactics . . . to induce [him] to make incriminating statements." The Defendant describes as false the Detective's statement to him that Mason had received information implicating him in the murder because Mason had not been told the Defendant's name, only where the shooter lived and worked. He further claims as coercive that

Detective Mason informed the Defendant that death was a possible punishment for murder in response to the Defendant's question about the penalties for murder, and that Mason told him that Mason would inform the District Attorney's office that the Defendant had been cooperative if the Defendant gave a statement. Finally, he claims as coercive Mason's statement to him that Mason was not interested in pursuing the Defendant's mother for any part she may have played in attempting to conceal evidence.

Confessions that are the result of physical or psychological coercion are deemed involuntary and inadmissible. See State v. Phillips, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (citing Rogers v. Richmond, 365 U.S. 534, 540 (1961)). "Coercive police activity is a necessary prerequisite in order to find a confession involuntary." Id. at 377. In order to determine whether a police officer has coerced a confession, the particular facts of each case must be examined, and "[t]he crucial question is whether the behavior of the state's officials was 'such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" Id. (citation omitted). It is the trial court's duty to determine the voluntariness and admissibility of a defendant's confession, State v. Pursley, 550 S.W.2d 949, 950-52 (Tenn. 1977), and the trial court's finding that a statement was given knowingly and voluntarily is binding on this Court unless the evidence preponderates otherwise. Odom, 928 S.W.2d at 23.

In this case, the trial court found that the Defendant's statements were made voluntarily and that Detective Mason used no tactics which overbore the Defendant's will. We agree. Detective Mason testified that after they arrived at the police station, he read the Defendant the rights waiver form. The Defendant indicated that he understood it, that he understood his rights, and that he wished to answer the detective's questions. The interview process lasted approximately two hours. Initially the Defendant claimed that he had loaned the assault rifle to someone else; when Detective Mason told him that "the story that he was telling didn't add up," the Defendant admitted his own involvement. Detective Mason testified that he made no threats against the Defendant to obtain his statement, and he did not promise the Defendant anything other than to tell the District Attorney's office that he had been cooperative. Detective Mason described the interview as "very calm." Detective Mason also stated that the Defendant did not appear during the interview to be under the influence of any drugs or alcohol. The evidence does not preponderate against the trial court's determination that the Defendant's confession was voluntary and admissible, and this issue is therefore without merit.

## DISCLOSURE OF CONFIDENTIAL INFORMANT

In his next issue, the Defendant asserts that the trial court committed reversible error by refusing to order the State to disclose the identity of the confidential informant from whom Detective Mason received his information about the shooter. Detective Mason testified that he received the information over the telephone from a person he knew and that the person had not been at the crime scene. Detective Mason assumed that the informant had received the information from someone else, but had been unable to confirm the informant's source as of the time of the hearing on the Defendant's motion to disclose. Subsequently, the prosecuting attorney informed the trial court that Detective Mason had reached his informant and confirmed that the informant had received the

information from a third party. The court was further informed that the informant was a minister and had received the information in the course of his role as minister and would under no circumstances reveal the name of his source. The trial court accordingly did not grant the Defendant's motion.

The Defendant now argues that the trial court should have ordered the State to reveal the minister's name and should have conducted a hearing to determine whether the clergy-penitent privilege could be properly invoked.[2] We respectfully disagree. This Court has previously set forth the parameters for the disclosure of a confidential informant's identity in State v. Vanderford, 980 S.W.2d 390, 395-97 (Tenn. Crim. App. 1997). In that case we noted that, "[a]s a general rule, the identity of a confidential informant is privileged. Thus, the state is not required to reveal the identity of an informant who has provided information leading to a defendant's arrest and conviction." Id. at 395. However, the privilege granted the confidential informant is not absolute, and whether the State should be ordered to disclose the identity of a confidential informant is a matter left to the sound discretion of the trial court. Id. at 396. The trial court should order the State to divulge the informant's identity in any of the following four circumstances: "(a) disclosure would be relevant and helpful to the defendant in presenting his defense and is essential to a fair trial; (b) the informant was a participant in the crime; (c) the informant was a witness to the crime; or (d) the informant has information which is favorable to the defendant." Id. at 397 (citations omitted). The Defendant has the burden of proving by a preponderance of the evidence that the confidential informant's identity is material to his defense because of any of these circumstances. Id.

The Defendant has failed to prove by a preponderance of the evidence that any of the four circumstances existed which would have required disclosure of the minister's identity. The informant was neither a participant in nor a witness to the shooting. There is no indication whatsoever that the minister had information favorable to the Defendant; rather, it was inculpatory. Finally, we fail to see how disclosing the minister's identity would have been helpful to the Defendant in presenting his defense or how it was essential to a fair trial. The Defendant argues in his brief that "had [he] been given the opportunity to investigate who had initially directed attention towards him as a suspect, he may have chosen to present [an alibi] defense at trial, depending upon the outcome of his investigation." However, long before the Defendant filed his motion to compel the disclosure of the minister's identity, he had admitted to being the assailant. We fail to see how an additional witness to the Defendant's actions would have assisted him in presenting an alibi defense or any other defense inconsistent with the one he actually presented at trial.[3] The Defendant having failed to carry his burden of proving the necessity of the confidential informant's identity and further having failed to demonstrate that the trial court abused its discretion in denying his motion for disclosure, this issue is without merit.

---

[2] See Tenn. Code Ann. § 24-1-206(a)(2).

[3] The Defendant does not argue, and we assume does not mean to imply, that the original "finger pointer" was the actual shooter.

SUFFICIENCY OF THE EVIDENCE

The Defendant next contends that the evidence is not sufficient to support his convictions for second degree murder and two counts of attempted second degree murder. We respectfully disagree. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

A defendant commits second degree murder when he or she knowingly kills someone. See Tenn. Code Ann. §39-13-210(a)(1). A defendant acts "knowingly" when he or she "is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). The Defendant claims in this appeal that the State failed to prove that he was aware that his actions were reasonably certain to cause someone's death. In the instant case, the Defendant acted knowingly if he was aware that repeatedly firing a high-powered assault rifle into a house at which twenty to forty people were partying; from which he saw two people leaving; and which he hoped contained at least one other individual; was reasonably certain to cause someone's death. The jury concluded that the Defendant was so aware, and we hold that the evidence supports the jury's finding. The proof established that the Defendant went to the house on Torbett Street with the express purpose of scaring someone he had earlier seen go in the house. The Defendant explained in his statement:

> I threw on my fatigues, some black shoes and a black jacket and I went there and when I got to the house somebody was comin' out. A girl. So I told her, "Just get down." I said, "Just get down" and she dropped . . . first she looked at me and she said, "What the f__k?" I said, "Get down." So I shot a shot off to the left side of me in the al... and then I started shootin' at the little corner of the window. And down with 'em. A couple of 'em hit the bricks and I think one or two o[f] 'em went through the window. And see, I didn't think it was a . . . they was having a party. I

didn't know that and I had . . . after I heard all of the running around and then screamin' and stuff, I paused for a minute 'cause I didn't think there was that many people in there.

When Detective Mason asked the Defendant what he did next, the Defendant responded:

Actually, I was in shock. Figurin' out, 'cause off the top, I'm thinkin' like damn, I believe I done shot somebody. I believe I done shot somebody. So I walked off and I got to the alley where Swett's Restaurant is. I hea[r]d some sirens and so I just cut over a fence and then went down the alley and came home. Set up for the next two days.

The Defendant also admitted in his statement that he shot the rifle until it ran out of bullets.

The Defendant deliberately emptied his assault rifle into a house that he hoped was occupied by a man he wanted to scare. Two women were leaving the house as he began firing. He shot, by his own admission, at least ten shots. He explained that he did not think "that many" people were in the house, but he clearly hoped at least one person was inside. Given that the gun was an assault rifle that the Defendant claimed to own for "home protection," the jury properly inferred that the Defendant knew the gun was capable of killing someone. The Defendant intentionally sprayed the front window of the house with gunfire from this weapon and then fled the scene, thinking "I done shot somebody." This proof is sufficient to support the jury's conclusion that the Defendant knowingly killed Herschel King. This issue is, therefore, without merit.

The Defendant also contends that the evidence is not sufficient to support his two convictions for attempted second degree murder. For the same reasons that we find the proof sufficient to support the Defendant's conviction for second degree murder, we find the proof sufficient to support his two convictions for attempted second degree murder. The Defendant deliberately sprayed numerous gunshots into a house that he hoped was occupied. His shots hit at least three people, killing one of them. Had the other two victims died, the proof would have supported three convictions of second degree murder. That two of the victims fortunately lived lessens the Defendant's criminal culpability to attempted murder, but no less. This issue is without merit.

SENTENCING

Finally, the Defendant complains about his sentence, arguing that the trial court erred in imposing the maximum sentences for each offense and erred further in ordering his sentences to be run consecutively to each other. When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). It is the Defendant's burden to show that his sentence is improper. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

-10-

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Brewer, 875 S.W.2d 298, 302 (Tenn. Crim. App. 1993); State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Pike, 978 S.W.2d 904, 926-27 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The weight given to mitigating and enhancement factors is left to the trial court's discretion. See State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim App. 1992).

Evidence at the sentencing hearing included the Defendant's presentence report and victim impact statements from John Hart and Cicely Mitchell. Herschel King's mother also testified. The trial court subsequently applied the following enhancement factors with respect to sentencing the Defendant on his second degree murder conviction: a) he has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his sentencing range; b) he used a firearm during the commission of the offense; c) he had no hesitation about committing the crime when the risk to human life was high; and d) he committed the crime under circumstances in which the potential for bodily injury to a victim was great. See Tenn. Code Ann. § 40-35-114(1), (9), (10), (16). The trial court gave "little or no weight" to the first of these factors. It gave "great weight" to the remaining factors, but considered factors (10) and (16) "one for the purpose of sentence calculation." In mitigation the trial court found that the Defendant had received his GED while in jail and was part of a close-knit family. See id. § 40-35-113 (13). The trial court gave these factors "no weight," however. The trial court then sentenced the Defendant as a Range I offender to the maximum sentence available for his crime, twenty-five years.[4]

The Defendant contends that the trial court erred in sentencing him to the maximum term for his murder conviction. He argues specifically that the trial court erred in refusing to apply in mitigation that the Defendant, because of his youth, lacked substantial judgment in committing the offense. See id. § 40-35-113(6). However, "[t]he application of this mitigating factor is not determined simply by the chronological age of the offender but, rather, upon the offender's 'youth in context' of various circumstances tending to demonstrate his or her ability or inability to

_____

[4]Second degree murder is a Class A felony. See Tenn. Code Ann. § 39-13-210(b). The sentencing range for a Range I offender on a Class A felony is fifteen to twenty-five years. See id. § 40-35-112(a)(1). The presumptive sentence for a Class A felony is the midpoint within the range, which in this case would be twenty years. See id. §40-35-210(c).

-11-

appreciate the nature of his or her conduct." State v. Elder, 982 S.W.2d 871, 879 (Tenn. Crim. App. 1998). At the sentencing hearing, the trial court specifically considered and rejected this factor, stating:

> The facts belie that and that is he gets mad at somebody. He plans an attack. He wears his dark clothing. He goes and gets a gun, and it is not just a gun. It's an S.K.S. Chinese assault rifle that has 40 rounds and incredible fire power to it, and he goes and starts shooting at a place where he knows is full of people. That is just, it may be stupid, but [the lack of substantial judgment factor] certainly doesn't apply.

The record supports the trial court's finding, and the evidence does not preponderate against the trial court's rejection of this mitigating factor. This issue is, therefore, without merit.

The Defendant also argues that the trial court erred by refusing to apply as a mitigating factor that he assisted the authorities in locating or recovering property involved in the crime. See Tenn. Code Ann. § 40-35-113(10). With respect to this factor the trial court found:

> I think the facts of the case were that when he got in the car with Detective Mason, he began to realize that his mother might be in trouble, that she knew where the guns were and the only reason he told the police where the guns were was to keep his mother out of trouble. He really didn't assist. He just was sort of caught and didn't have much of a choice perhaps in his mind, but I'm not going to find that factor.

Again, the record supports the trial court's findings, and the evidence does not preponderate against the trial court's rejection of this mitigating factor. This issue is without merit.

The Defendant also contends that it was error for the trial court to apply as an enhancement factor that he used a firearm during the commission of the crime. The Defendant asserts that "[s]ince it is virtually impossible to conceive that any murder could be committed without the use of a deadly weapon, . . . this enhancement factor should not apply to a conviction for second degree murder." We respectfully disagree. It is not in the least difficult to imagine numerous scenarios in which one person murders another without using a deadly weapon. Moreover, this Court has previously held that this enhancement factor may properly be applied to a sentence for second degree murder. See State v. Hampton, 24 S.W.3d 823, 832 (Tenn. Crim. App. 2000). This issue is without merit.

The Defendant also contends that the trial court erred in applying as an enhancement factor that the murder was committed under circumstances where the "potential for bodily injury to a victim was great." See Tenn. Code Ann. § 40-35-114(16). The trial court applied this factor "because of the large number of other persons who were in close proximity to the victims who were actually injured." Panels of this Court have reached different conclusions with respect to the applicability of this factor where the potential for bodily injury is not to the victim of the crime, but to other persons in the "zone of danger." In State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995), a panel of this Court held that this factor may be applied "where individuals other than the victim are in the area and are subject to injury." See also State v. Michael Lebron Taylor, No. 03C01-9810-CR-00366, 1999 WL 692579, at *6 (Tenn. Crim. App., Knoxville, Sept. 8, 1999) (where there were other potential victims in the area subject to injury, application of this factor to sentence for attempted

especially aggravated robbery was appropriate); State v. Terrence T. Wiggins, No. 01C01-9806-CR-00241, 1999 WL 447322, at *3 (Tenn. Crim. App., Nashville, July 1, 1999) (majority of panel holding that this factor was applicable to sentences for attempted voluntary manslaughter and reckless endangerment where defendant fired shots from car in chase and other drivers and bystanders were in the vicinity). In State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000), a different panel of this Court refused to apply this factor based on a risk to others, finding that "victim" referred to the victim of the crime: not other potential victims. See also State v. Donald Marbley, No. M1999-01212-CCA-R3-CD, 2000 WL 1521487, at *11 (Tenn. Crim. App., Nashville, Oct. 4, 2000) (holding that "enhancement factor (16) may not be used on the basis of risk to others"); State v. Joseph Oscar Price, III, No. 01C01-9810-CR-00421, 1999 WL 1063414, at *5 (Tenn. Crim. App., Nashville, Nov. 24, 1999) (this enhancement factor "can only be applied when the risk of bodily injury is to the victim [of the crime]"); State v. Charles Justin Osborne, No. 01C01-9806-CC-00246, 1999 WL 298220, at *3 (Tenn. Crim. App., Nashville, May 12, 1999) ("the enhancement statute does not contemplate application of factor (16) based on risk to others"). Given that the actual statutory language of the enhancement factor refers to the crime having been committed under circumstances under which "the potential for bodily injury to a victim was great," we think the latter line of cases may be in better accord with the legislature's intent regarding this enhancement factor. However, we think it unnecessary to decide this issue in this case. The trial court combined factors (10) and (16) for the purpose of determining the length of the Defendant's sentence, and the Defendant rightfully makes no argument that factor (10) is not applicable. Given the "great weight" the trial court gave to factors (9) and (10), and given the paucity of the mitigating factors, we find no error in the trial court's imposition of the maximum sentence for the Defendant's second degree murder conviction. This issue is without merit.

The Defendant also complains that the trial court erred in sentencing him to maximum terms of twelve years for each of his two attempted second degree murder convictions.[5] In making its determination on these sentences, the trial court drew the same conclusions as to mitigating factors. It applied the same enhancement factors it relied on in sentencing the Defendant for the murder conviction, plus two additional factors: the personal injuries inflicted upon the victims were particularly great, and during the commission of the felonies, the Defendant willfully inflicted bodily injury upon another person. See Tenn. Code Ann. § 40-35-114(6), (12). The trial court utilized factors (10) and (16) in determining the Defendant's sentences for the attempted murders to the same extent it utilized them with respect to his sentence for the murder. Additionally, it gave "great weight" to factor (6).

The Defendant makes the same arguments as to these sentences that he does with respect to his murder sentence, and our analysis and rejection of those arguments is likewise the same. Additionally, the Defendant argues that the trial court erred in applying enhancement factor (12), that during the commission of the felony, he willfully inflicted bodily injury upon another person. The

---

[5]Attempted second degree murder is a Class B felony. See Tenn. Code Ann. §§ 39-12-107(a); 39-13-210(b). The sentencing range for a Class B felony for a Range I, standard offender is eight to twelve years. See id. § 40-35-112(a)(2).

Defendant argues that the proof does not support a finding that he willfully injured anyone. While this is a close issue under the circumstances of this case, we find ourselves constrained to agree. Black's Law Dictionary defines "willful" as "[p]roceeding from a conscious motion of the will; voluntary; knowingly; deliberate. Intending the result which actually comes to pass; designed; intentional." Id. at 1599 (6th ed. 1990). As set forth above, the proof is sufficient to show that the Defendant "knowingly" committed these crimes. We do not think, however, that the proof is sufficient to establish that the Defendant "willfully" injured anyone, in that he did not deliberately point the rifle at a particular person with the intent of shooting that person. Cf. State v. Jimmy A. Salyer, No. 03C01-9803-CR-00093, 1999 WL 812484, at *7, 10 (Tenn. Crim. App., Knoxville, Oct. 8, 1999) ( where the defendant "repeatedly aimed his pistol and shot at [the victim]," factor (12) was properly applied to the defendant's sentence for attempted second degree murder); State v. Freddie Joe Day, Jr., No. 03C01-9602-CC-00076, 1997 WL 785673, at *8 (Tenn. Crim. App., Knoxville, Dec. 16, 1997) (factor (12) applicable to sentence for especially aggravated kidnapping accomplished with the use of a deadly weapon where defendant "intentionally struck the victim over the head with his weapon, causing bodily injury"); State v. Brian Swick, No. 03C01-9509-CC-00282, 1996 WL 277953, at *5 (Tenn. Crim. App., Knoxville, May 28, 1996) (where defendant was convicted of felonious reckless endangerment for speeding by pedestrian officer and running over the officer's foot, factor (12) was inapplicable "because the State failed to establish that the appellant's conduct in running over the officer's foot was willful").

Our agreement with the Defendant on this point, however, affords him no relief. The trial court properly applied five enhancement factors and no mitigating factors to his convictions for attempted second degree murder, and maximum sentences are therefore appropriate. This issue is without merit.

Finally, the Defendant contends that the trial court erred by ordering all of his sentences to be served consecutively to each other. The trial court ordered consecutive service on the basis that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(4). To impose consecutive sentences on this basis, the trial court must also find that consecutive sentencing is reasonably related to the severity of the offenses and necessary to protect the public from further criminal conduct by the defendant. See State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). In support of its determination that the Defendant is a dangerous offender, the trial court found as follows:

> The proof revealed that the defendant chose to arm himself with an SKS Chinese assault rifle with the intention of exacting revenge upon another whom the defendant perceived to have had shown disrespect towards the defendant. The defendant chose this particular rifle, with a muzzle velocity of 2400 feet per second, energy expulsion of 1500 foot pounds, and a magazine capacity of forty rounds of ammunition, over a much smaller and less destructive .22 caliber weapon.[6] The defendant then stood in front of a crowded house and shot the assault rifle.

---

[6] The Defendant admitted in his statement that he also owned a .22 rifle.

Projectiles peppered the house going through windows and walls with the result being the death of one and the severe injury of two others. The defendant went home to hide the rifle and then returned to the scene to mingle among bystanders as the injured were being treated and the crime was being investigated.

. . . .

The Court finds the facts of the murder and attempted murders especially violent and shocking. The testimony at trial showed that the defendant shot the victims while the victims were attending a party and enjoying the prospects of the end of the school year. Additionally, the proof showed that the defendant fled the scene in an attempt to elude police detection and to hide the murder weapon. The severity of these offenses as well as the need to protect the public from future actions such as these by the defendant warrant the application of both of the Wilkerson factors in this case.

We agree with the trial court that the Defendant's actions in this case demonstrate the need for, and appropriateness of, consecutive sentencing. This issue is, therefore, without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE